for the appellant, Global TelLink, which we all call GTL. We ask this court to reverse and to enforce GTL's arbitration agreement with Mr. Hobbs. We ask it to do so on the basis of a common-sense principle, and that principle is that when a company states that a proposed bargain is subject to terms and conditions, it puts the customer on reasonable notice that entering into the bargain constitutes acceptance of those terms. It didn't use the term subject to, right? It used the term governed by. Go ahead. The terms of use are, so in this case, on five separate occasions, Mr. Hobbs called GTL on the telephone. Each time, GTL's phone system played an automated recording that said, please note that your account and any transactions you complete with GTL are governed by the terms of use and the privacy statement posted at www.connectnetwork.com. And nothing happened after that. You didn't punch a number. You may know with a lot of companies, you punch a number then that you accept, you transfer, you reaffirm. You didn't punch in numbers or do anything. You just listened, right? That is correct. It's rarely the case when parties are transacting by telephone that they punch in a number. In this case... That's certainly not in the record, I'm sure, but go ahead. My question wasn't either. In this case, what Mr. Hobbs then did was talk to a live operator. The first time he spoke with a live operator in February of 2015, he declined. He heard the automated message, then talked to a live operator, then he declined to open an account. We believe the reason he declined to open an account was that he realized that the facility that his son was at was not actually served by GTL. Before we get too far along, the Third Circuit's case, why doesn't that pretty much resolve this case? Two reasons, Your Honor. One is it applied New Jersey law rather than Texas law. New Jersey law is, in a very important way, distinct from Texas law. Under Texas law, there are two requirements for assent. One is reasonably conspicuous notice of the existence of contractual terms, and two is that the terms be readily accessible. We laid that out in our brief about pages 20 through 22. Under New Jersey law, by contrast, and I can just read you from what the James Court actually said, mutual assent requires that the parties have an understanding of the terms to which they have agreed. That's citing to the New Jersey Supreme Court's decision in the Attlees case. This is just another quote from James. The party bound by the terms must have had knowledge of and assented to the incorporated terms. That is to say, under New Jersey law, there is a heavy emphasis on the customer's actual knowledge of the arbitration agreement, and more than that, the fact that arbitration constitutes a waiver of a right to a jury trial. The Attlees case, the New Jersey Supreme Court decision in Attlees, is quite remarkable. In that decision, the New Jersey Supreme Court held that it is not sufficient to say in a contract, you agree to binding arbitration. On top of that, in order for an arbitration agreement to be enforceable in New Jersey, the contract must say, and just so you know, arbitration means that you are not going to have your case resolved by a court. You are going to have the case resolved by an arbitrator. You rate Texas as a restatement of contracts, Section 69, Section 19, the basic sections, right? I don't think there's any disagreement with respect to the basic sections, but I think where the disagreement arises is with respect to the basic principle that we ask this court to adopt, which is, again, that when a company says in plain English that a proposed transaction is subject to terms and conditions or to be governed by terms and conditions, if I agree to enter into that transaction, I'm accepting the terms. And there are legion cases that adopt that principle. The Hubbard case, which applies Texas law, involved a situation where a customer bought a Dell computer. And Dell said, again, in very plain English, all sales are subject to terms and conditions of sale. And the court had no difficulty determining that by agreeing to buy the computer, the customer was agreeing to accept the terms and conditions. Judge LaValle, in a Second Circuit case called Register.com, has a somewhat quainter example, but I think it's equally apt.  And it says apples are $0.50, $0.50 a piece. If somebody then goes into the fruit stand and takes an apple, they are, by agreeing to enter into that transaction, accepting the terms of sale, the $0.50. What about when you pull in to park, you know, and they give you your ticket, and they say stick it in your pocket, you stick it in your pocket, and later you look at it and it's got a contract on the back. Do you think that's a contract? Absolutely, Your Honor. If you are on notice of the existence of terms, and then you agree to enter into the transaction. You don't find it until later and you drive through? Surely that's not a contract. I was trying to pose an easy one to you. Okay. Well, if there is no notice until after the transaction is completely finished, then the question might be different. But here we're talking about a situation in which Mr. Hobbs had a 30-day right to opt out of the contract, either the entire contract or just the arbitration clause. So the terms of use of GTL say if you open an account, you have 30 days to decide, first look, find the terms of use, then decide whether you accept them. And if you don't accept them altogether, or if you just don't like the arbitration agreement, you can opt out of either one of those two things. And that's quite similar to what Judge Easterbrook said was perfectly acceptable in the Hill against Gateway case. And I would emphasize that case for this court because that case, again, is quite apt. What Judge Easterbrook said in Hill is, and it involved a telephone transaction just like this, is when a customer calls and wants to buy something by phone, the challenge on the part of the company is to try to find a way to communicate the terms in writing. Nobody wants the terms to be communicated to them orally on the phone. Even if recorded, counsel? I beg your pardon? Even if recorded? Yes. Judge Easterbrook's whole point is that in the context of consumer... No, I think Judge Easterbrook's point is... No, no, no. I'm sorry. Let's talk plain. It's objective. The standard here is objective. Do you agree? Yes, it is. Wouldn't you rather have it recorded? I state the terms, you say yes, and that's recorded? I don't think so, Your Honor. Oh, boy. Go ahead. And the reason is that in the context of consumer transactions, what the customer values more than anything is getting the transaction done expeditiously. If you had to sit on the phone and listen every time you called up the airline and said, I want to buy a ticket to wherever, to a 10-minute litany of... I think that's a straw argument, though, because the smart people do one where you can listen to them again if you punch another number. You know, they first say to you, you know what they do, they first say to you, you've previously complied for our terms and conditions, do you want to try five again, or do you want to hear them? Punch one, punch three. Get it? Well, certainly there are other ways to design the system, but what I... Well, Your Honor, I think what companies are trying to do is balance the consumer's demand for expeditious transactions and the objective on the part of a very, very small number of consumers, let's be honest about it, to actually be able to see these terms. And I think that the design of the GTL system appropriately strikes that balance by saying you are... Please note, there are terms of use that govern this transaction. Here's where you can find them. And for the small minority of people that want to find them, it is very easy to go on the Internet. You said there were two distinctions from James? Oh, yes. Have we covered both of them, or are we just covering one of them? Thank you for letting me get back to the second. I think the second distinction in James is that James relies very heavily on the notion that this is a telephone transaction with publication of the terms on the Internet. And I think that Hill is part of the answer to that in the sense that what Judge Easterbrook is saying is that when you transact by telephone, the consumer needs to get the terms in writing. In that case, Gateway was selling a product. And so what Judge Easterbrook said is it's perfectly sensible for the company to include the terms and conditions in the package of the product and then give the consumer 30 days to look at the package, read the terms if he wants to, and then return the product if he's dissatisfied. Here you're equating writing with electronic, right? What I'm equating in the... Because you're not going to get a writing here. You're going to go on and look at the website and do it. Exactly. So writing and electronic mean the same thing to you, right? From the standpoint of a company that provides a service, in other words, we have no computer that we're going to send to the customer. So we can't put something in the package that the customer can then read. So what we do instead is we say, what's the next best thing for trying to communicate these terms in writing to someone who we're not going to be corresponding with through the mails? The best way in this day and age is to post the written terms on the Internet. You're equating electronic with writing. By the way, there are uniform acts that do this. I'm not trying to beat you up, but you're saying that, right? I'm saying that especially in the context of the kind of transaction that we're doing here, it is, especially nowadays, a readily accessible way to publish written contract terms to a consumer to say they're online, you can find them. Electronic equal writing. You appear to be resisting that. Your Honor, I don't think they're actually equal. I think that in many ways electronic is superior to writing in the sense that if you want to look at these terms and conditions anywhere in the world, 24 hours a day, 7 days a week, you can do it from your smartphone. Whereas if what we did was mail these terms and conditions to people in the mail, if it got lost or if they were away from home or whatever, it actually does not provide as readily accessible access to the terms as Internet publication does. I see I'm into my rebuttal time, which I'd like to reserve with the Court's permission. Is there a live operator involved in these initial calls? There is. What happens is you hear the automated recording right off the bat. You don't get past go. But if you don't have a pen and paper handy to write down www.connectnetwork.com and you missed it, you could ask the live operator. Wait, what happens after the recording? Does a live operator come on? A live operator comes on. You have every opportunity to request clarification. I heard there was a website, but I didn't get it down. And again, Mr. Hobbs heard this recording five times. He spoke with a live operator on five separate occasions. The first time, as I mentioned, he didn't open the account. The next four times, he opened the account and deposited money. On no occasion did he ever ask the live operator anything. And the repeated nature of this transaction, I think, confirms that with respect to Mr. Hobbs, and the inquiry, again, is a reasonable person in Mr. Hobbs' circumstances, that he did get reasonable notice of the existence of the device. In James, were there multiple contacts? In some cases, there were. Good morning, counsel. How is it pronounced, Mafa? Mafa, yes. Very well. Good morning, Your Honors. May it please the Court, I am Donna Siegel Mafa, and I am appearing on behalf of the appellee, Rocky Hobbs, who is the certified representative of a nationwide class. I urge you, obviously, to affirm the district court's decision. The district court got the analysis completely right. It applied Texas law as Texas law requires it to be applied in determining whether a contract was formed. It applies Texas law with regard to the requirement that there must be notice of the contract, and there must be mutual assent, and there must be manifestation of assent. And in this regard, the district court also got, especially with regard to the manifestation of assent, the issue precisely the way the Third Circuit and the district court in New Jersey did in James. And with regard to the issue of manifestation of assent, New Jersey law does not differ from Texas law or restatement law. Does New Jersey follow the restatement as strictly as Texas does? I do not know that, Your Honor. I do know that New Jersey has some differences with regard to the amount of knowledge that's required, but that's a different issue because it's a two-step inquiry, and the inquiry is, do you have notice of the contract, of the agreement to arbitrate? And the second point is, have you expressed mutual assent? And as the district court here correctly determined, in the context of this factual scenario and the objective facts presented to the district court, there was not sufficient either notice that a bargain was being proposed, and I did notice that my colleague mentioned that a bargain was being proposed, but that's not exactly what was stated to the consumer who was calling, in this case Mr. Hobbs, in order to put money into an account so he could talk to his son in prison. Wasn't he getting something in return for putting money in the account? He was definitely getting a call, the ability to pay for a call. And I would say to Your Honor, in every circumstance with the question of So that was the bargain? That is the core of the bargain. Whether there are additional terms and conditions that are attached to that bargain is not apparently clear or conspicuous. Well, that's a separate question, but you said before there was nothing to show that a bargain was being proposed, and I thought, well, there must be a bargain. He's paying money. He's getting something back. That's a very good point, and yes, you're correct. There's a core transaction going on. There's a core transaction, and then the recording says the terms of use are on the website. The recording says, Please note that your account and any transaction you complete with GTS, PCS, DSI, ITI, or VAC are governed by the terms of use and privacy statement posted at www.connectnetwork.com. The terms of use and privacy statement were most recently revised on July 3, 2013. That took me about 20 seconds to say. And then a live operator comes on. It does not say we're proposing terms of a contract. It does not say, as the district court properly found, and if you continue with this call, you are assenting to those terms of a contract. It does not say press this button and you can hear the terms of the contract. It does not say press this button to indicate that you assent to the terms of the contract. There is nothing in that statement that indicates that terms of a contract are being proposed for which your conduct manifests intent. And that is the criteria that has been established under the law in Texas. What do you think the closest Texas case is? Well, there's two of them. I think that the Southwest, which is a district court case, the Southwest Airlines versus I think it's Board First, and also I think the recent Doe case, which has been appealed, I understand, concerning employees and employment policies, is also on point in that it, too, makes clear that what you need to have is a reasonably conspicuous statement of a policy or a contract and an affirmation of assent, and that when a conduct is interpreted to be affirmation of assent, the person who is engaging in that conduct must have reason to know that that conduct will be so interpreted by the offeror. Is the Doe case in your brief, counsel? Oh, it's Stowe versus Capitol Hill North. Yes, it is. Okay. And also it's the case, I believe, that the defendants recently submitted in their 28-J to the court. Yes, it is. That it was appealed. It has not, obviously, what the outcome might possibly be on appeal can't be taken into account here, but I would note that the facts in that case, while the principles cited, are the ones we rely upon, and the principles cited are the ones that Texas courts are applying in terms of notice and manifestation of assent. The circumstances there were very different because it was an employee who had had intranet access to the policy involved. The employee was directed at orientation to look at the intranet, and the employee was also told that they were responsible for being familiar with those things. None of that applies here. Here all we have is a statement which, as I read before, simply just said, you know, your account is governed by the terms of use and privacy statement. It says transactions to counsel. Now, the district court has a little bit of a magic words section in it where they talk about magic words that would work. Why is it transactions close enough to the magic words that even the district court says that would work? The district court in? Yeah, the district court says no words like contract consent, agree, assent, offer, accept, and the like. Because I think that those convey more to a person that we are giving you some choice here, giving you a bargain, contract, and you have a choice to accept these provisions that will apply to it or not. And I think that that is why in many of the electronic contracting cases to which a defendant says this is analogous, you see what often impacts courts, and they've identified these as the factors, conspicuousness and clarity, spatial and temporal proximity. These are the things. So when you have Internet contracting and a link appears on the bottom of every page, as it did in the Myers v. Uber case, which the Second Circuit reversed the district court on, that is a circumstance where in blue writing at the bottom of the registration page, there's a link that says here you can get this. Spatially and temporally in that circumstance, you have immediate access to the terms and conditions. I thought the district court was not concerned about spatial and temporal. The district court thought that a reasonable person would think that the recording was referring to what it called summations of generally applicable legal rights and duties that were imposed on providers and users of inmate calling services alike by third-party state actors. The district court, I think, posited. What does that mean to you? That means to me that the court was saying, you know you're calling someone out of prison. There's a possibility that these calls are governed by restrictions and rules that are different than everyday calling, and that that is possibly what that could have referred to in the recording, where it says any tracts and transactions you complete are governed by the terms of use and privacy statement. For instance, monitoring. You know your call is going to be monitored if you're calling a prison. Those types of things. The district court did not say that was the way that the audio notice would be interpreted, but he said that was a possibility, and that was one reason that he concluded that you could not say that there was notice of contractual terms that you were being asked to assent to and that your conduct in continuing constitutes assent to. I would also say with regard to, and so the district court here was not, you're right, the district court was not looking at the temporal or spatial proximity. The district court was saying this is what was told to you. This doesn't notify you, and under Texas law, if you're told something that could mean one thing or another thing, that's not sufficient to put you on notice. Is that reasonable, do you think, to believe that the company was referring to prison regulations? Is that what you're saying? I'm saying it could very well be when you're calling a third-party number, GTL. So here, call GTL if you want to talk to your son in prison. You call, and they say any calls, any accounts, anything you use this account for is governed by terms of use and privacy statement. Yeah, it could mean that. It certainly doesn't mean on its face that we're offering you terms of a contract. It doesn't give you the opportunity to see spatially and immediately what it is you're being offered, like it is in many of the other cases where BrowseRack and ClickRap are enforced and determined to be sufficient to give notice. It doesn't equate to when you receive a package, which in most cases where someone signs up online or signs up over the phone. I believe that in Hill, the terms were provided subsequently. Mr. Ho said, well, Hill's instructive here, but it's just the Internet age, so it's different. You can just tell someone an Internet address. You could say to someone, what's your Internet, what's your email address, and we will send you the terms and conditions. That's very similar to someone mailing terms and conditions, which has often been the case in the past. The circumstances here are such that, and as the James Court found, as the district court here found, as the district court in New Jersey found, that there was not sufficient information to advise someone that they were entering a contract and that they were manifesting assent by continuing to use the funds that they put into that account to talk to their loved one. As they said in James, they neither received GTL's terms of use, neither, and this is the last page of the decision. What page are you on? Go ahead. I'm on the last page of the decision. 268? Go ahead. Yes. Go ahead. Here, we need not consider the particular design or content of GTL's website, obviously, because Apelli's transaction with GTL occurred over the telephone. They neither received the terms of use, and I would add, nor were they put in near proximity or provided subsequently. That's not what the court says, but go ahead. Nor were they informed that merely using GTL's telephone service would constitute assent to those terms. In using that analysis and making that the determinative points, which is essentially the same points the district court here did, the courts are just applying basic contract law. Of Texas. Of Texas, and also that's pretty common across the country. It doesn't have some heightened requirements. It's the basic contract law. You've got to know that proposed terms are being offered to you, and you have to know that by acting in a certain way, your conduct will be interpreted as assent. Unless you have specific questions, I will wrap up with that basic tenant. It's true. It's the Internet age. It's true that there's telephones and this was interactive voice, but you have to look at the reality of the circumstance, and in this circumstance, was the statement provided sufficient to give notice of terms and conditions that were being offered and that governed the use of the service, that were proposed to govern the use of the service, to quote Mr. Ho, and that by continuing and making that phone call, you were agreeing to those terms and conditions. My final point would be is you cannot look at the terms and conditions to determine whether or not for the 30-day opt-out, because it doesn't make any sense if you're not put on notice that you ought to look at the terms and conditions, then there's no reason for you to look at them, and then you won't see the opt-out provision. So you think it comes down to whether telling the person that transactions are governed by the terms of use on the website conveys that those terms of use are contractual terms? I think it comes down to the same, yes, basically, and that's the same thing it comes down to in any contract, and what's come down in electronic contracting, the clarity and conspicuousness. Well, I mean, Judge Brooks went off on this idea that they might have been prison regulations that were the terms of use, but suppose it's clear that terms of use means terms proposed by the company that's offering the service. Do you think there's still a problem in that the user has to go to a website and look them up, or is that a reasonable thing to ask of a consumer? I actually don't think it's a reasonable thing to ask a consumer, and I think that the cases dealing with proximity, which do establish that courts generally do look at, how easy is it for you to get to those terms and conditions? I don't think it's right to place on the consumer a burden to go out and search down something that you referred to fleetingly in an audio, and I just don't see that. I also don't think you can divorce. Well, there was a live operator there, right? Well, we have no idea what that live operator said. No, no, I'm saying your client could ask the operator. But why would they? Because they just heard this reference to the terms of use, but they didn't get the website name because you said it was fleeting, so they might want to get the address so they can look up the terms. I don't see why a company's burden should be less in this circumstance of interactive phone communication than any other where courts have held. You have an obligation to place in a conspicuous, reasonably conspicuous position the terms and conditions that you're seeking to bind somebody to, whether that be in the wrapping you send them after they sign up on the phone, whether it be on the internet in a hyperlink at the bottom, whether it be in a box that says, yes, I accept these terms and conditions, but in those circumstances, there's an immediacy and an ability to access it that is not here, and I think that's further heightened when you deal with a circumstance where it's audio only. And I do think in that circumstance, the fact that you are intending and trying to call someone in a prison does make it less reasonable to assume that the statement made refers to a contractual circumstance, that proposal that is set up by GTL and contains terms and conditions that have nothing to do with making a call to a prison. But the person calling knows they're making a deal and getting a service and paying money, right? Oh, yeah, they have to. And that's true in every single circumstance. And then that's true in every circumstance where courts have held, you know what, this wasn't sufficient to form an arbitration agreement. You bought something, sure, you transacted something, but it's not sufficient to say that these are terms of use that you've agreed to and you've agreed to be subject to an arbitration agreement. Anything further? Thank you for your argument. Thank you. Judge Brooks rejected all of plaintiff's arguments but one, and it's the one that Judge Colleton alluded to, which is the notion that GTL's notice didn't contain, as Judge Benton put it, magic words and could have been misunderstood as being prison regulations. With all respect to Judge Brooks, we don't think that on de novo review, that holding survives scrutiny. For one, as Judge Colleton pointed out, the context here is a bargain, a proposed bargain. An exchange of telephone services for money. And under Texas law, in particular the Hawes case that we cite, it is absolutely clear that you consider the context in determining whether the customer or the counterparty had reason to know. So the bargaining context here is clear. Two, the language does actually allude to terms about bargaining. Terms of use are widely understood to mean a contract. The term transactions with GTL confirms that the language refers to a contract. So we have context and we have language. And then third, we have what the Meyer court and the Schwartz court in the second and third circuits concluded, which is that it's an unreasonable result otherwise. Mr. Hobbs comes before this court conceding that there was a contract. But on Mr. Hobbs' view, the contract had no written terms whatsoever. In fact, on Mr. Hobbs' view, the entire contract was implied in law and everything about the contract, including the term about price, rates, would have to be supplied by a court. So if Mr. Hobbs were to try to enforce the contract, for example, we would have to be in front of a district court and the district court would have to decide for the parties what the reasonable rate was. That's not a reasonable commercial outcome. It's frankly unreasonable, as the Schwartz court concluded. Now you say Judge Brooks rejected every argument but that one, but did he really address this notion of spatial and temporal proximity because he concluded, as you just mentioned, that the terms of use might not have been contractual terms, so he never really got to those other issues? Well, I think he did because in the preceding paragraph, he notes that under Texas law, and if there were adequate notice, it would not be a bar to enforcement that he never signed it, never clicked, or never had an opportunity to review the terms of use prior to using GTL services. So you think he's saying there that you don't need the kind of spatial and temporal proximity? That's right, and that's because Texas law, there are Texas cases that basically adopt the view that Judge Eastbrook has that it is effective for consumers, efficient for consumers to get the terms of use even after the fact and to have an opportunity to review them and then decide whether to cancel them later. And in this case, how could the consumer get those terms? The consumer could type in www.connect.com and then with one click It's connectnetwork.com. I'm sorry, you're exactly right, Your Honor, connectnetwork.com. More letters to screw up, go ahead. And with one click after that, he or she would see the terms of use. Does it come down to a question of reasonableness? It does, Your Honor, come down to the question of reasonableness, and I think in this day and age where, as Chief Justice Roberts said in the Riley case, an alien from outer space could be forgiven for thinking that smartphones are a part of the human anatomy. I think it is reasonable for businesses to be able to expect that if they publish things clearly and conspicuously on a website that that constitutes effective notice of the terms. We live in an internet economy, and it's important for consumers to be able to obtain written terms in an effective way, in an efficient way, and I think internet publication should be accepted as a reasonable process for doing that. Well, let's see, Chief Justice Roberts says how old now? He's viewing it through the eyes of a 50-something old person. I'm viewing it through the eyes of an 83-year-old judge who's totally out of contact with reality. Well, let me say this. If the court has doubts about whether it is reasonable in the abstract to expect someone to access the internet, at the very least, there ought to be a remand, because a subsequent deposition of Mr. Hobbs revealed that he owns an internet business. He called his business a mini-Amazon. It's an internet fulfillment business. So there is no question that, again, Mr. Hobbs, at the very least, is not in the position of someone who, unlike Chief Justice Roberts, might... Are we to assume, or are we to make any assumptions about the level of the sophistication of the people who are using this system in terms of their real-world knowledge? Well, I think that the standard, as you said, Judge Wolman, is a reasonable person, a person... And so we look to see what ordinary Americans' experience is. Short of that, I think it is quite relevant what Mr. Hobbs' own background and experience are. Which militates, at the very least, again, for a remand for a trial. We thank both sides for the argument. The case is now submitted.